O

**FILED**

AUG − 8 2011

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION AT SANTA ANA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

|   |   |
|---|---|
| CUAUHTEMOC A. REYES, | Case No. CV 11-0531-MLG |
| Petitioner, | MEMORANDUM OPINION AND ORDER |
| v. | |
| DOMINGO URIBE, Jr., Warden, | |
| Respondent. | |

## I.    Background

### A. Procedural History

On January 30, 2007, Petitioner Cuauhtemoc Reyes was convicted by an Orange County Superior Court jury of kidnaping for extortion (Cal. Penal Code § 209(a)). (Clerk's Transcript ("CT") at 706-708, 904, 912.) Petitioner was sentenced to life in prison with the possibility of parole. (CT at 1112-1114.)

Petitioner appealed his conviction to the California Court of Appeal, arguing, *inter alia*, that his due process rights were violated when the trial court admitted into evidence, over

Petitioner's objection, a lock pick set found during the execution of a search warrant at his home. (Lodgment 3.) The court of appeal affirmed Petitioner's conviction in a written opinion on the merits. (Lodgment 6.) Petitioner filed a petition for review in the California Supreme Court, raising the same claims he had presented in his earlier appeal, which was summarily denied. (Lodgments 7 & 8.)

On April 6, 2011, Petitioner filed the current petition for writ of habeas corpus, raising the same due process claim involving the lock pick set presented to the state courts. (Pet. at 5.) Respondent has filed an answer and Petitioner has filed a traverse.[1]

**B.   Facts**

The underlying facts, which are supported by the trial record, are taken essentially verbatim from the unpublished opinion of the California Court of Appeal. *People v. Cuauhtemoc Agustin Reyes, et al.*, No. G038778 (Cal.App. 4th Dist., November 2, 2009) (Lodgment 6).

Around 9:00 p.m. on November 16, 2001, Farsheed Atef had just left an electronics store in Fountain Valley. As he placed his purchases in the trunk of his car, he noticed a white van parked in the adjacent stall with its door open. A man approached Atef, asking if he would like to view merchandise in the van and, when Atef rebuffed him, the man and an accomplice tried to abduct him. Atef broke free after a struggle and ran, yelling for help. The occupants of a silver, two-door Honda pulled alongside to offer their aid, and Atef jumped into the car through an open passenger window. The Honda sped off.

Atef realized that he had been set up when his would-be rescuers

---

[1] The parties have consented, pursuant to 28 U.S.C. § 636(c), to the exercise of jurisdiction by the undersigned Magistrate Judge.

ignored his pleas to take him to a police station and instead turned down a deserted road. Atef kicked the steering wheel, causing the Honda to veer and collide with a pole. The white van approached and parked behind the Honda. Atef escaped from the Honda and tried to flee but two men tackled him to the ground. They forced him into the back of the van, blindfolded him, and took his wallet and keys.

Despite the blindfold, Atef saw that one of the men from the Honda had joined the two in the van, which began traveling south on the 405 freeway. The van left the freeway after about 10 minutes and pulled into a parking lot. Another man, whom Atef later identified as Arthur Zavala, entered the van and began screaming that Atef had stolen money from someone and they were "here to get it back."[2] The van then drove to the parking lot of a Travelodge motel, where Zavala threatened to harm Atef and his family if he did not cooperate.

The men took Atef to a room in the motel and told him that he would be held until he withdrew $80,000 from his account the next day. Atef denied that he had that much money in his account and stated that he believed that Tamraz was behind the kidnaping. Zavala twice unsuccessfully attempted to verify the balance in Atef's bank account, punching Atef in the head after each failed attempt. The next morning, Zavala ordered Atef to obtain his business account number from his brother, Saeed. Zavala called the bank and learned that Atef's account balance was only $44,000.

Zavala told Atef that they were taking him to the bank to withdraw the money, and if he did not comply, they would frame him

---

[2] Atef testified at trial that he ran a computer consulting business in Tustin and that, some time before the kidnaping, a former account manager, Anthony Tamraz, left the company on "bad terms," and had filed an $80,000 civil suit against Atef.

for bank robbery. Zavala instructed Atef to write a note on an envelope stating, "I'm here to rob the bank. I hold anthrax in an envelope, so do not scream, and put money in a bag." Zavala furnished Atef with an envelope containing white powder. Zavala instructed Atef that, if he could not withdraw the entire $44,000 in cash, he should get a cashier's check in the name of "John Smith" for the balance.

After learning from the teller that he could only withdraw $10,000 in cash, Atef obtained a cashier's check made out to "John Smith" for the rest. Attempting to arouse suspicion, he wrote "Anthony Tamraz Newport Travelodge" at the top of the cash receipt and told the teller to provide the ticket "if anyone asks any questions." Atef left the bank and spotted a police car in the parking lot, but the patrol car left. Atef did not see the kidnapers' white van. Meanwhile, the teller had called the police after noticing that Atef remained in the parking lot for 15 or 20 minutes. The police vehicle returned and Atef reported to the officer what had happened to him.

Investigators discovered that Petitioner Reyes had used an expired driver's license to rent the Travelodge room around 8:30 p.m. on the night of the kidnaping, about a half-hour before Atef was abducted. The address on Reyes's expired driver's license led police to a post office box at a Newport Beach company named Commercial Mail Receiving Agency. In speaking with an employee there, the police learned Reyes might have a cellular phone account with AT&T Wireless and with that information were able to obtain a search warrant for cell phone records which revealed Reyes's current address and more than 50 calls between Reyes's phone and Zavala's phone during the kidnaping. Cell tower records placed Reyes along the route Atef

4

traveled on the day of the kidnaping and at or near the Travelodge when the room was rented as well as the bank where Atef was taken to the bank the next day. Zavala's phone records showed that he called both Atef's business and bank during the kidnaping. Reyes cancelled his cell phone account a few days before police arrested him in December 2007.

The police apprehended Reyes and Derek Howard at Reyes's home. Howard's cell phone records and calls to and from Reyes placed him near the scene of the kidnaping and along the route Atef traveled earlier in the day. Searching a cabinet in Reyes's kitchen, the police found a photographic proof sheet and 35-millimeter negatives that included photos of Atef as well as his residence and business. The police found a 35-millimeter camera and lens in Reyes's closet. They also found a lock pick set and photographs of Zavala in the kitchen. Elsewhere in the apartment, they discovered a black bag containing two hand-held radios and the paperwork for a police scanner. They also found a parabolic microphone and headset listening device, an item described as a "scope," and a business card for "Fox's Spy Outlet," advertising a specialization in stun guns, protective sprays and surveillance equipment. Tucked in a day planner in a cubby hole in the bedroom, police found Reyes's expired driver's license and a Disneyland identification card.[3] A backpack in the dining room contained Reyes's cell phone, pager, and his current driver's license. The police also found Howard's driver's license on the living room couch and his cell phone on the coffee table.

The police arrested Arthur Zavala at gunpoint at his apartment

---

[3] The clerk at the Travelodge motel had noted on Reyes's room registration card that he worked at Disneyland.

after he tried to escape when they announced they had a warrant for his arrest. Atef identified Zavala in a photo lineup as the kidnaper who had punched him several times and who took charge of obtaining his financial information and funds from his bank. Atef also identified a man named David Vargas as one of the two men who first approached him from the white van and tried to abduct him. He identified Robert Cadavas as one of the men guarding him in the motel room. DNA evidence recovered from the motel room matched Vargas and Cadavas. Vargas and Cadavas pleaded guilty to simple kidnaping before trial in exchange for eight-year prison terms. Howard also pleaded guilty to simple kidnaping and received a one-year jail term.

Reyes's defense at trial was that Howard had set him up by using his cell phone and the other items recovered at Reyes's apartment, including falsely registering the motel room in Reyes's name. Reyes's handwriting expert testified that the signature on the Travelodge registration form was "most likely" someone else's, although the expert acknowledged that it was "possible" that Reyes had signed the form.

## II.  Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), federal habeas corpus relief is available to state prisoners who are in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). To establish a right to relief, a petitioner must show that the state's highest court rejected the petitioner's claim on the merits, and that this rejection was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

6

1  Supreme Court of the United States," or was "based on an unreasonable
2  determination of the facts in light of the evidence presented in the
3  State court proceeding." *Id.* § 2254(d); *Harrington v. Richter*, ---
4  U.S. ---, 131 S.Ct. 770, 783-84 (2011).

5      It is not enough that a federal court conclude "in its
6  independent judgment" that the state court decision is incorrect or
7  erroneous. *Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004) (quoting
8  *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (per curiam)). "The
9  state court's application of clearly established law must be
10  objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75
11  (2003); *see also Renico v. Lett*, --- U.S. ---, 130 S.Ct. 1855, 1865
12  (2010). AEDPA imposes a "'highly deferential standard for evaluating
13  state-court rulings, which demands that state-court decisions be
14  given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455
15  (2005) (quoting *Woodford*, 537 U.S. at 24); *Vasquez v. Kirkland*, 572
16  F.3d 1029, 1035 (9th Cir. 2009).

17      Habeas relief is unavailable if "fairminded jurists could
18  disagree" about the correctness of the state court decision. *Richter*,
19  131 S.Ct. at 786 (quoting *Yarborough*, 541 U.S. at 664)(internal
20  quotation marks omitted). For habeas relief to be granted, "a state
21  prisoner must show that the state court's ruling on the claim being
22  presented in federal court was so lacking in justification that there
23  was an error well understood and comprehended in existing law beyond
24  any possibility for fairminded disagreement." *Richter*, 131 S.Ct. at
25  786-87.

26      The claim raised in the instant petition was presented to the
27  California Supreme Court, but that court did not issue a reasoned
28  decision. (Lodgment 8.) Accordingly, this Court must "look through"

the unexplained California Supreme Court decision to the last reasoned decision as the basis for the state supreme court judgment. *See Mendez v. Knowles*, 556 F.3d 757, 767 (9th Cir. 2009) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)). The California Court of Appeal, in a reasoned opinion on the merits, rejected Petitioner's claim of error. (Lodgment 6.) Therefore, this Court will consider the reasoning of the California Court of Appeal to determine whether the California Supreme Court's decision is contrary to, or an unreasonable application of, clearly established federal law.

## III. Admission at Trial of Evidence of a Lock Pick Set Did Not Violate Petitioner's Due Process Rights

As noted, Petitioner contends that the admission into evidence of a lock pick set found in his apartment was fundamentally unfair and violated his right to due process. (Pet. at 5; Mem. of P & A at 11-20.) However, the state court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established law. *See* 28 U.S.C. § 2254(d).

At trial, Petitioner objected to the admission of the lock pick set that had been found in his home. He argued that it was not relevant because there was no indication that a lock pick set had been used during the kidnaping and that it was improper character evidence. (Reporter's Transcript ("RT") at 522-523.) The prosecutor argued that the lock pick set, along with the photographs, surveillance equipment, and other evidence found in Reyes's apartment, were being used to show Reyes's ability to facilitate the kidnaping, and not for any improper purpose. (RT at 523.)

The trial court held that the challenged evidence was relevant

8

to the issue of Reyes's ability to facilitate the crime and was not being used to show evidence of other crimes or Reyes's propensity to commit crimes. (RT at 705-706.) The lock pick set was admitted for the limited purpose stated by the prosecutor. (Id.)

In rejecting Petitioner's claim of error, the California Court of Appeal first noted that California courts have found that the possession of burglary tools, whether used in the commission of a crime or not, is properly admissible as demonstrating a defendant's felonious intent to commit a burglary. (Lodgment 6 at 13.) In this case, the court of appeal noted the similarity between possession of burglary tools and Petitioner's possession of the lock pick set:

> As the prosecutor argued, the tool set was similarly relevant to Petitioner's intent to kidnap the victim because, like "[t]he high tech scope as well as the listening device that was found [and] the walkie-talkies, the lock pick is just another tool of the trade that can be used for kidnapping a person if you need to get into a room or a vehicle that they are in."

> Unlike a gun, with its many lawful uses, possession of a lock pick set bears rationally on Petitioner's preparation and intent to commit a crime. Consequently, admission of the set did not constitute unlawful disposition evidence. Petitioner does not suggest the trial court failed to keep the prosecutor on a short leash to avoid suggesting the lock pick set connected Petitioner to any other crimes or that it showed he was a person of bad character. Accordingly, we discern no error in the admission of the evidence.

(Lodgment 6 at 13-14.) (Citations omitted.)

To the extent that Petitioner is claiming that the trial court violated California state law in admitting the lock pick set, this claim fails to state a cognizable federal habeas corpus claim. A federal court may issue a writ of habeas corpus only on the ground that the petition is in custody in violation of the Constitution or laws of the United States. *Wilson v. Corcoran*, 562 U.S. ----, ----, 131 S.Ct. 13, 15, 178 L.Ed.2d 276 (2010) (per curiam) (quoting 28 U.S.C. § 2254(a)); *see also Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("[f]ederal habeas corpus relief does not lie for errors of state law") (citing *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)). In this regard, the Supreme Court has never clearly held that "admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issue of the writ." *Holley v. Yarborough*, 586 F.3d 1091, 1101 (9th Cir. 2009).

Even so, the erroneous admission of evidence may violate due process, but only when "there are no permissible inferences the jury may draw from the evidence." *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005) (quoting *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991)). Even then, evidence must "be of such quality as necessarily prevents a fair trial." *Jammal*, 926 F.2d at 920. The due process inquiry on federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *See Estelle*, 502 U.S. at 67; *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995).

Here, there were permissible inferences to be drawn from the challenged evidence. Even though a lock pick set was not used in the kidnaping, the jury could reasonably infer Petitioner's preparation and intent to commit the crime based upon its presence in his

apartment. The evidence presented to the jury showed that the kidnaping was planned and coordinated and that various items, such as those found in Petitioner's apartment, were procured to facilitate the kidnaping. As noted by the court of appeal, the evidence of the lock pick set found in Petitioner's apartment, along with other various items that could be used to facilitate a kidnaping, such as hand-held radios, paperwork for a police scanner, a scope, and a portable parabolic microphone and headset listening device, were relevant to show that Petitioner intended to commit and prepared for the kidnaping. *See* Cal. Evidence Code § 1101(b) ("Nothing in this section prohibits ... admission of evidence ... relevant to prove ... intent, preparation, plan, knowledge, identity....") The evidence was also relevant to rebut Petitioner's defense that he was uninvolved in the crime and that his friend, Derek Howard, had used his cell phone and identification without his knowledge to perpetrate the kidnaping. Thus, the discovery of the lock pick set, along with other items that could be used to facilitate the kidnaping, in Petitioner's apartment, was relevant to disprove Petitioner's defense that Howard had committed the crime without his knowledge. There was no due process violation.

Finally, even assuming a due process violation, any error was harmless given the overwhelming evidence of Petitioner's guilt. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993). The evidence of the lock pick set was merely one piece of a strong case in which the prosecution presented overwhelming evidence linking Petitioner to the kidnaping. Petitioner's cell phone records showed that he made more than 50 calls during the time of the kidnaping to Zavala, whom the victim identified as being one of the men who kidnaped him. (RT at

364-366.) Cell tower records also showed that Petitioner was in close proximity to the victim immediately prior to and during the time of the kidnaping. (RT 168-197.) The Travelodge hotel records showed that Petitioner rented the room around 8:30 p.m. on the night of the kidnaping, only 30 minutes before the victim was abducted. The expired driver's license and Disneyland identification card used to rent the room were both found hidden in his apartment. (RT 357-358, 416, 445-449, 460-465, 502-509, 562-563, 566, 570, 597-598, 605-607.) Police also found 35-millimeter negatives of the victim and his home and business in Petitioner's apartment, as well as a 35-millimeter camera, paperwork for a police scanner, and various items of surveillance equipment. Also found was a business card for "Fox's Spy Outlet," advertising a specialization in stun guns, protective sprays, and surveillance equipment. (RT 442-443, 444, 445, 452-456, 470-473, 503, 566.) In addition, Derek Howard's cell phone records and calls to and from Petitioner placed him near the scene of the kidnaping and along the route the victim traveled earlier in the day. (RT 192-201.) Police apprehended both Petitioner and Derek Howard together at Petitioner's apartment. (RT 367-370, 434-445, 600.)

Given the overwhelming evidence linking Petitioner to the crime, any possible error in admitting the lock pick set cannot be said to have had a substantial and injurious effect on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993) (trial type error must have had a "substantial and injurious effect" upon the verdict in order to justify federal habeas relief); *see also Fry v. Plilar*, 551 U.S. 112, 121-122 (2007). Accordingly, Petitioner is not entitled to habeas relief on this claim.

//

**IV.  Order**

The petition for writ of habeas corpus is **DENIED.** In addition, because Petitioner cannot make a colorable claim that jurists of reason would find debatable or wrong the decision denying the petition, Petitioner is not entitled to a Certificate of Appealability. *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

DATED: August 8, 2011

Marc L. Goldman
United States Magistrate Judge

13